## A. BLEDSOE V. THE INTERNATIONAL RAILROAD COMPANY.

1. A *mandamus* will issue only when the duty to be performed is ministerial in its character; and when the duty is imposed upon the officer requiring the exercise of judgment or discretion, a *mandamus* will not lie.

2. The word "ministerial," when applied to an official act, has reference generally to an act done under authority of a superior; and in this sense it could never apply to the chief executive with respect to anything required by the legislative authority.

3. The act of countersigning and registering the bonds by the Comptroller contemplated by the charter of the International Railroad Company was not a mere clerical or ministerial duty, but it was the duty of the Comptroller, as well as of the Governor, to see to it that the proper and necessary work to be done by the company before the bonds could issue under the law had been performed.

4. The District Court has not the power or authority under the Constitution to compel an officer of the Executive Department of the government to perform an official duty.

5. Under the former Constitutions the supreme executive power was vested in the Chief Magistrate; under the present Constitution it is vested in the entire body of magistracy composing the Executive Department, with the powers of each separately defined.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

On the fifth day of August, 1870, a special act was passed by the Legislature of the State of Texas entitled "An act to incorporate the International Railroad Company, and to provide for the aid of the State of Texas in constructing the same." The Governor of the State neither approved the bill nor returned it to the house in which it originated, and the same became a law by reason of executive non-action within the constitutional period. So much of that act as is necessary to a proper understanding of this case is set forth in the opinion.

On the eighteenth of November, 1873, the International Railroad Company brought suit in the District Court of Travis county against A. Bledsoe, Comptroller of the

State, alleging that, under the terms of its charter, the International Railroad Company was organized and proceeded with the construction of its road, and on the twenty-fifth of November, 1871, the president of the road notified the Governor of Texas, in writing, that fifty-two miles thereof had been completed, and thirty-three other miles graded and prepared for the iron, and formally offering fifty miles of said railroad for inspection; that an appointment of inspectors was made December 2, 1871, and their reports submitted on the eleventh and thirteenth of December, 1871, showing that in the construction of fifty miles the company had fulfilled the requirements of the charter; that on the twenty-second of April, 1872, the Governor transmitted to the Treasurer three hundred one thousand dollar bonds, as provided for in said charter, requesting the signature of that official to each of them, and that he, after signing them, turned them over to the Comptroller to be countersigned and registered; that on the fourteenth of March previous, two hundred similar bonds had, in like manner, been transmitted; that these bonds were returned by the Comptroller to the Governor without being "countersigned and registered," and his reasons for non-action stated.

The company prayed for a decree directing that a peremptory *mandamus* be issued to A. Bledsoe, commanding him, as Comptroller of the State, to countersign and register and return to the Governor the five hundred bonds transmitted to him by the Governor through the Treasurer, and for general relief.

On the seventh of February, 1873, the defendant, Bledsoe, appeared and demurred generally and specially to the petition, assigning as special causes of demurrer, among others, the following:

"1. That it was in effect a suit against the State.

"2. The Comptroller cannot be compelled to exercise his official discretion in any particular way."

Bledsoe further answered, specially setting out at length that the passage of the act of incorporation was procured by means of fraud, bribery and corruption, and was therefore null and void ; that the act was not read in each house of the Legislature on three several days, as required by the Constitution, unless in case of great emergency. He also filed a general denial.

On February 8, 1873, plaintiff excepted generally to the answer of defendant, and on the same day filed an amended petition.

On the eighth of March, 1873, defendant filed also an amended answer, alleging that the plaintiff, its agents and employés, procured the passage of the act of incorporation by promising and paying to various members of the Legislature large sums of money as an inducement for their votes upon the act, and the said members were thereby unduly influenced, and under such influence did vote for the passage of said bill ; and that therefore the act was void.

On March 9 the company filed motion for a peremptory writ of *mandamus*, and on the same day the court rendered its decision on the various demurrers, overruling all of defendant's demurrers, and also the exception of petitioner to defendant's first plea in bar, and sustaining petitioner's exceptions to the other plea, to which rulings both parties excepted.

On March 9, 1873, the Attorney-General filed a plea of intervention in the name of the State, which, upon demurrer and exceptions of petitioner, was dismissed. Exceptions taken to this action of the court were abandoned in this court, and this court requested by the Attorney-General to dismiss intervenor's appeal. Other orders and proceedings were had, which are not material to be noticed, and on the third day of July the cause came on for trial. Defendant moved for a continuance, which was overruled and a trial had. Judgment was rendered for

plaintiff, commanding the Comptroller to countersign and register the five hundred bonds specified.

Defendant on the same day moved for a new trial on various grounds, which was overruled, and separate appeals taken to the Supreme Court by the defendant and intervenor.

The errors assigned by Bledsoe were—

"1. The overruling defendant's application for a continuance.

"2. The overruling defendant's demurrers.

"3. Error of the court in all its rulings adverse to defendant, as shown by bills of exception.

"4. Error of the court in overruling the motion for a new trial."

The bonds were signed by the State Treasurer, and delivered by him to the State Comptroller on the twenty-fourth of April, 1872.

The reasons assigned by Comptroller Bledsoe for returning the bonds to the Governor without their being countersigned and registered were stated in his letter accompanying them. No objection seems to have been made to the performance by the company of the obligations imposed by the charter, but the Comptroller expressed a doubt as to the power of the Legislature to impose on him the duty of levying a tax to meet the liabilities growing out of the issuance of the bonds. He expressed his desire to have a legislative interpretation of the company charter at the next session, and based his refusal to countersign and register the bonds chiefly on the fact that he believed it would impose on the people a burden of ruinous taxation.

The case was submitted to the jury with instructions to return a verdict upon two special issues, in response to which the following verdict was returned:

"1. We, the jury, find the allegations of the plaintiff's petition to be true.

"2. We, the jury, find the allegations of fraud not true."

The briefs filed in this cause were able and exhaustive upon several points not discussed or decided in the opinion; the discussion of these points in the briefs is therefore omitted.

*Wm. Alexander, Attorney-General,* for appellant.— If the Legislature itself cannot tax us for any other than a public use; if it has no constitutional power to levy a tax to make a present; if the parts of the charter pointed out are null and void, and if neither it nor any other statute, public or private, levies the requisite tax, what power has the comptroller to countersign, etc., and to assess? What right has the company to a *mandamus* to compel him to countersign, etc., and to assess without a levy?

A *mandamus* does not lie, even in a court that has original jurisdiction, to compel any officer to do against his judgment and will any act involving an exercise of official discretion. (Arbery v. Beavers, 6 Texas, 457; Commissioner General Land Office v. Smith, 5 Texas, 471.)

No authority has been adduced, and none is believed to exist, showing that it is competent for the Legislature, under our Constitution—its chief power of attorney—to create an artificial person (see The State v. The S. P. R. R. Co., 24 Texas, 121) and vest it with privileges in derogation of common right, which it could not confer upon a citizen.

*Geo. Clark, Attorney-General,* also for appellant, contended that neither the District Court of Travis county nor any other court can compel one of the heads of the executive department to perform an official duty, no matter what the duty may be, or in what manner it may be devolved, citing Houston Tap and Brazoria Railroad v. Ran-

dolph, 24 Texas, 317; Section 1, Article 11; Section 7, Article 5; Section 1, Article 4, State Constitution; and argued that the Constitution of Texas differed in this respect from most of the other States in which the supreme executive power was vested in the Governor alone. (Dennett, Petitioner, 32 Maine 508; Mauran v. Smith, 8 Rhode Island, 192; State v. The Governor, 1 Dutcher, N. J., 331; Law v. Towns, Gov., 8 Ga., 360; Hawkins v. The Governor, 1 Ark., 570.)

It will thus be seen that the case of the Houston Tap and Brazoria road stands not alone as a bright star in the legal firmament, and that, although it has advanced the principle to a point beyond the others, the advance was made with cautious step, and that it rests upon a foundation of solid constitutional principle which cannot be shaken.

All those authorities, Federal and State, which hold a doctrine adverse to that contended for in argument, when examined, are found to turn back to and rest upon the famous case of Marberry v. Madison. What did the court decide in that case? Nothing except that it had no jurisdiction. If there was no jurisdiction, how could it be rightfully determined whether a *mandamus* could be awarded in a supposed case? Does it not present a strange anomaly for a judge to say he has not jurisdiction, and still declare what a court might or would do if it had? The rule was discharged in that case for a want of jurisdiction; and while the opinion should be justly esteemed for its reasoning, its force and authority as precedent cannot be invoked, for it never had any. Its enunciations are not applicable to the case at bar, on account of the difference between the Federal Constitution and that of the State of Texas, in designating and constituting the executive department. The court will bear in mind that the doctrines announced in that opinion met with marked disfavor among the fathers who had made the Constitu-

tion, and who were disposed sedulously to guard it from infraction. We have Mr. Jefferson's authority for saying that if the Supreme Court had granted a *mandamns* in that case, he should have regarded it as trenching upon his appropriate sphere of duty ; that he had instructed Mr. Madison not to deliver the commission, and that he was prepared, as President of the United States, to maintain his own construction of the Constitution, with all the powers of the government, against any control that might be attempted by the judiciary in affecting what he regarded as the rightful powers of the Executive and Senate within their peculiar departments. (Jefferson's Works, Vol. 4, pp. 75, 317, 372.)

But the argument is brought forward that for every right there must be a remedy, and the idea seems monstrous to some that the official action of an every-day officer like the Comptroller is not subject to judicial control. It is urged that a citizen may be wronged by a decision of the Comptroller, and that government is a failure which does not secure him redress by judicial investigation and determination. Counsel fails to see any force in the argument. Certain duties are assigned to the judiciary, and yet who is so bold as to say that no citizen is ever wronged by their decision ? Not because judges are corrupt, but because they are men just as the Comptroller is. Is not the latter officer vested necessarily with powers *quasi*-judicial, and does he not pass judgment every day upon the rights of citizens, and from his judgment there is no appeal ? The same power put him there that placed the judges upon the bench—with this advantage in favor of the Comptroller, that in his case the power was exercised direct, while with the judges it is exercised in a manner indirect. The duties of the Comptroller are now and have been well defined in the Constitution. That of the judges is also well defined. Are the latter selected on account of their supposed peculiar

fitness for the discharge of their duties, and the former not?

II. If the court below had jurisdiction, this was not a proper case for its exercise. The duty imposed by the act in question necessarily required on the part of the Comptroller an exercise of discretion or judgment, and a *mandamus* will not lie to control it. When the act to be done involves discretion in determining whether the duty exists, it is not to be deemed merely ministerial. (Commissioner v. Smith, 5 Texas, 471; Board v. Bell, Dallam, 366; 7 Cranch, 504; 6 Wheat., 598; 11 Peters, 524; 14 Peters, 497; 6 Howard, U. S., 92, 100, 101, 102.)

It is admitted that upon a casual glance at Section 9 of the act, set out at length in the statement of the case, it would seem that the Comptroller had nothing to do but to "countersign and register" the bonds. But a critical examination manifests that the duties devolved upon him are of an extraordinary character. The section hardly admits of the construction that it became the duty of the Governor, Treasurer and Comptroller, immediately after the act became law, to have the whole amount of the bonds engraved, signed, countersigned and registered, and deposited with the Governor, to be by him delivered to the company at stated times upon the completion of each section. The Governor is hardly the proper custodian of the bonds of the State, and the section itself draws a distinction between the issuance and delivery of the bonds. It provides "that no bonds under this act shall be issued to said company until it shall have completed at least twenty miles of said railroad, whereupon said bonds shall be issued and delivered for the amount of said railroad, and thereafter for every ten miles, according to the terms of said charter."

The delivery must be made by the Governor, but who issues the bonds? Not the Governor alone, for he is incapable of performing this act alone. The issuance must

be performed by all three officers, by affixing to the bonds their proper official signatures, but this issuance shall not take place until twenty miles of said road are completed. How completed? According to the terms of the charter—that is, "in a thorough and substantial manner." Who is to determine this fact? The Governor alone? The law does not say so, and it would seem a singular construction to hold that the Comptroller and Treasurer were mere figure-heads and must perform this important official duty upon the *ipse dixit* of the Governor, when the law is entirely silent upon this point. I take the true meaning and intent of the section to be that the law having provided that no bonds were to be issued until the completion of twenty miles of the road in a thorough and substantial manner, the officers charged with the duty of issuance must determine the question each for himself as to whether twenty miles had been completed, and, if so, whether in a thorough and substantial manner, before affixing his signature. If so, the discretion and judgment devolved upon each is clear.

It may be contended, that the law having provided a mode in which these facts were. to be ascertained, the sworn statement of the chief engineer of the company, together with the sworn report of the inspecting officer of the State, were conclusive, and neither the Governor. nor Treasurer had authority to gainsay or go behind them. A contingency can easily be concieved wherein such result would not ensue. Suppose the sworn reports to the contrary, notwithstanding the Governor should ascertain that twenty miles of the road had not been completed, or that the work was defectively done, and that through corrupt influence sworn reports were obtained, would he be authorized to deliver bonds? The determination partakes necessarily of a judicial character, involving questions both of law and fact. While the law pre-

35

scribes the evidence upon which a determination is to be had, it does not exclude other evidence, cumulative or rebutting.

Again, the Comptroller is intrusted with a large discretion as to the amount of tax to be raised each year in order to meet the payment of the semi-annual interest and to provide two per cent. as a sinking fund. Suppose these bonds are required to be issued all at once, and deposited with the Governor, how is the Comptroller to know what number of bonds have been delivered to the company, and what amount of tax is necessary? It may be answered that the Governor will inform him from time to time, but the law makes no such provision. Is it not clearly within the purview of the act that the Comptroller is to countersign and register such number of bonds as might from time to time become necessary, and that with the countersigning, registering and issuance of each batch he should immediately take steps to have a sufficient tax assessed and collected to meet the interest and sinking fund? How else is he to know the amount of tax necessary? And yet it may be contended that he must perform this important duty without inquiring as to whether the company had complied with its charter or not. Sufficient discretion is vested in him to enable him to bankrupt the people of the State by the assessment and collection of an onerous tax (if such proceeding is constitutional), and yet no discretion is given him to enable him to determine whether any tax is necessary at all. This would seem an absurdity. The law contemplated that he, as well as the others, but he especially, should determine when the company was entitled to its bonds, and the proper amount it was entitled to upon each application, and no court has authority to say that his determination was wrong, and to control the discretion with which he is vested.

*Walton, Bell* and *Pease,* for appellee.—The law vests in the Governor the discretion and judgment to decide when the defendant is entitled to these bonds. This discretion and judgment has been exercised by the Governor, who has issued the bonds and done everything in his power towards a delivery of them to the plaintiff.

The State is not in default, and the plaintiff has no occasion to sue her.

The plaintiff has no cause of complaint against any one but the defendant for his failure to perform the mere clerical or ministerial duty of countersigning and registering the bonds—a duty in regard to which nothing is left to his discretion or judgment.

The plaintiff is without remedy under our laws unless a *mandamus* can be obtained to compel the defendant to perform the ministerial duty of countersigning and registering these bonds.

The authority of the District Court to issue a *mandamus* in a case like the present one is sustained by repeated decisions of this court.

In support of that authority we refer to the case of Commissioner of the General Land Office v. Smith, 5 Texas, 471, in which Judge Wheeler says: "The practice of resorting to this proceeding against this officer, and to enforce the performance of this particular duty, is believed to have had its origin almost as early as the creation of the office itself, and to have been continued without a question as to its legality down to the present time. (2 Texas, 581.) But the right to this writ in a case like the present rests upon other authority than the practice of the courts. By a statute of the Congress of the Republic, approved twenty-fifth of January, 1841 (5 Statutes, 84, Sec. 9), it was enacted that 'all writs of *mandamus* sued out against the heads of departments or bureaus of the government shall be made returnable before the District Court at the seat of government.' It is well

known that this statute was adopted in consequence of a practice then prevailing of calling upon the Commissioner of the General Land Office, by process from the courts of remote counties, to show cause against the issuance of this writ in cases like the present in such distant counties. This act clearly recognizes the right to obtain the writ at the seat of government; and it must, moreover, be regarded as a legislative recognition of the legality of the practice then existing of employing this writ as a private remedy, for it was its use in practice as such which the Legislature undertook to regulate. The use of the writ as a private remedy seems to be comformable to modern practice." And he refers to 3 Howard, 100.

In the same case Judge Wheeler says: · "It has been, however, by a series of decisions of the Supreme Court of the United States, decided that a *mandamus* will issue to an officer of the government only when the duty to be performed is ministerial in its character; but that when there is imposed upon the officer by law a duty requiring the exercise of judgment or discretion, a *mandamus* will not lie to control the exercise of that discretion." (12 Pet. R., 524, 609; Id., 497; 7 Cranch, 504; 6 Wheaton, 598; 6 Howard, 92; Board of Land Commissioners v. Bell, Dallam, 366.)

"Respecting the general rule, there does not appear to have been any question. But the difficulty has been in making its application to particular cases, and determining in such cases what acts are to be considered as ministerial and what not. The distinction between ministerial and judicial and other official acts seems to be, that when the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial; but when the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial."

We refer also to the case of Meyer v. Carolan, 9 Texas, 252, in which Judge Lipscomb says: "It was said by this court, in discussing the grounds on which a *mandamus* could issue, 'it is an undoubted principle of law that this writ will not issue against a public officer unless to compel the performance of an act clearly defined and enjoined by law, and which is therefore ministerial in its nature, and neither involves any discretion nor leaves any alternative.' (Glasscock v. Commissioner of General Land Office, 3 Texas, 53; 12 Peters R., 524; 14 Peters R., 514; 3 Howard, 100.) The same rule is laid down by the court in Cullum's Administrator v. Latimer, 4 Texas, 329." And he then quotes at considerable length the foregoing opinion of Judge Wheeler.

In Horton v. Pace, 9 Texas, 81, the court does not question the right to issue a *mandamus* in a proper case, but the writ is refused because it is sought to compel an officer to do an act in violation of a statute, and because the facts do not show a necessity for the survey sought by *mandamus*.

We also refer to Stewart v. Crosby, 15 Texas, 546, in which appellant had prayed for an injunction restraining the defendant (Commissioner of General Land Office) from issuing patents to Catlett & Johnson, who were made defendants; and also prayed for a *mandamus* to compel Crosby to issue patents to plaintiff. Catlett & Johnson answered and prayed for a *mandamus* against Crosby to compel him to issue patents to them. The first *mandamus* was refused, and the last one was issued by the District Court. This judgment was affirmed, the opinion having been delivered by Judge Wheeler.

In McClelland v. Shaw, 15 Texas, 319, Judge Wheeler does not question the principles contended for, but refuses the *mandamas* because the party was not entitled to the right he claimed.

In Puckett v. White, 22 Texas, 563, Judge Wheeler lays down the same principles.

In Durrett v. Crosby, 28 Texas, 694, Judge Moore says: "There is no principle more firmly settled on reason and authority than that a *mandamus* will not issue to compel a public officer to perform an act unless it be clearly enjoined and defined by law, and therefore ministerial in its character, and involves neither the exercise of discretion nor leaves any alternative."

In Tabor v. Commissioner of General Land Office, 29 Texas, 520, Judge Smith lays down the same principles.

In the case of the Houston and Great Northern Railroad Company v. Kuechler, Commissioner of General Land Office, 36 Texas, 382, a *mandamus* was issued against the Commissioner to compel him to issue land certificates under "An act to encourage the construction of railroads in Texas by donations of land," and the court quotes the above cases with approval.

In opposition to this array of authorities, the appellant will probably rely on the cases of Hosner v. De Young, 1 Texas, 769, and League v. De Young, 2 Texas, 500, and Marshall v. Clark, 22 Texas, 23, in each of which there is an intimation that these particular cases are in effect suits against the State, which cannot be sued without its consent. It will be observed, however, that the decision in neither of these cases was placed on that ground solely. The two first were applications for a *mandamus* against a county surveyor to compel him to make surveys upon what are commonly known as "fraudulent certificates," upon which he was prohibited to make a survey by express statute.

The opinion in both of these cases is really and mainly placed upon the grounds that the law had given the parties another remedy, which they had neglected to avail themselves of, and that the surveys sought to be enforced by *mandamus* were expressly prohibited by statute. In

the last case the decision was also really and mainly placed upon the ground that the act was not defined and enjoined by law, and that there was no authority of law for doing the act for which the *mandamus* was asked.

The decisions of this court since these cases show that it has never considered them as having the effect contended for by appellant.

The Supreme Court of the United States certainly does not consider them as having that effect. For in the case of Davis v. Gray, 16 Wallace, 203, which was an injunction granted by the United States Circuit Court of Texas restraining the Governor and Commissioner of the General Land Office of Texas from issuing patents on surveys made within the reservation granted to the Memphis and El Paso Railroad Company, the court say, "that making a State officer a party does not make the State a party, although her laws may prompt his action, and she may stand behind him as the real party in interest. That a State can be made a party only by shaping the bill expressly with that view, as where," etc., and it is well known that that court is governed by the decisions of the highest State court in cases that arise under the laws of the State.

In support of the plaintiff's right to a *mandamus* in this case we also refer to the following cases in the Supreme Court of the United States, and in the Supreme Courts of other States of the Union, in which it has been held that a *mandamus* would be granted against public officers in cases similar to this: 1 Cranch, 137; 12 Peters, 526; 5 Ohio State, 529; 23 Missouri, 353; 4 Minnesota, 309; 7 Ohio State, 372; 5 Hamilton, Ohio, 358; 8 Monroe, Ky., 440; 14 Arkansas, 687; 10 Wisconsin, 518; 6 Ohio State, 318; 4 Michigan, 27; 12 Ohio, 54; 3 Indiana, 452; 19 Barbour, 472; 23 Barbour, 339; 1 Selden, 65; 15 Barbour, 529; 12 Barbour, 607; 4 Hill, 634; 41 Maine, 15; 17 Howard, 275; The People v. Secretary of State *et al.*, 58 Illinois, 90.

Nor is the case of the Houston Tap and Brazoria Railway Company v. Randolph, 24 Texas, 317, an authority against appellee's right to a *mandamus* in this case. The *mandamus* prayed for in that case was refused mainly upon the insufficiency of the petition. It did not, as the court held to be necessary, clearly appear that the applicant had a clear right to the thing demanded, and that it was the plain duty of the officer to do the act required of him. Indeed, it was obvious from the charter and the facts of the case that the plaintiff was not entitled to the loan from the school fund which was demanded.

The court also refused the writ because the act which it was sought to force the Treasurer to perform was not only official, but required the exercise of his judgment as an officer, and involved important questions of law as well as fact, which are enumerated and commented on in the opinion of the court. When this case is properly understood, it certainly does not warrant the conclusion that the court entertained the slightest intention of annulling its own former decisions, as well as those of England and every court in America, that a public officer may be required by writ of *mandamus* to perform a purely ministerial duty, positively required by law, and involving neither official judgment nor discretion. When considered in connection with the facts of the case and the grounds upon which it was decided, the force and pertinency of the comments upon the general dictum and principles of law in respect to *mandamus* can be readily perceived and are appreciated.

In one particular, however, this case is a strong authority in favor of appellee. It holds that the warrants issued by the board of school commissioners to the railroad company applying for a loan are conclusive that it had done the work required by law, and was free from any adverse claim. So in the present case, the action of the Governor conclusively determined the performance of

the acts by reason of which appellant was entitled to the bonds. The transmission of the bonds, after being signed by the Governor and Treasurer, to appellee was conclusive as to him of appellant's right to them, and left nothing open for his determination, and nothing for him to do beyond the mere ministerial duty of countersigning and registering them as matter of security and protection of the State against forgeries or fraud.

J. W. FERRIS, SPECIAL JUSTICE.—This case is brought here by an appeal from the judgment of the District Court of Travis county awarding a peremptory *mandamus* against the appellant, A. Bledsoe, Comptroller of the State of Texas, and commanding him to countersign and register five hundred State bonds, calling for one thousand dollars each.

The action is based upon an act of the Legislature of this State, passed August 5, 1870, entitled, "An act to incorporate the International Railroad Company, and to provide for the aid of the State of Texas in constructing the same," and more particularly upon the 9th Section thereof, which is as follows:

"SEC. 9. In order to secure and promote the rapid construction of said railway, and thereby afford cheap and necessary facilities for emigration into the State, as well as speedy communication between the northeastern and southwestern boundaries, and with the Eastern and Northern States, and to meet, as soon as practicable, the wants of the people of this State in promoting the settlement of the vacant lands and development of its resources, the State of Texas consents, binds and obligates itself to donate, and hereby grants to said company, the bonds of the State of Texas to the extent and amount of ten thousand dollars per mile for each mile of said railroad constructed under this charter; said bonds to be of the denomination of one thousand dollars each, payable to the

company or bearer in thirty years from the date thereof,
with interest at the rate of eight per cent. per annum,
payable semi-annually, viz., on the first day of January
and the first day of July of each year; said bonds
to have coupons attached for each installment of inter-
est which may become due—which said coupons shall
be made payable upon presentation at the city of
New York, through such agents of the State as the Gov-
ernor may select and appoint to pay the same; said
bonds shall be signed by the Governor and the Treasurer
of the State of Texas, and countersigned and registered
by the Comptroller, with the seal of the State of Texas
affixed thereto, and shall be delivered by the Governor to
the president or such other officer of said company as
shall be specially appointed to receive and receipt for the
same, on the sworn statement of the chief engineer of
said company, and the written report of such officers or
agents of the State as the Governor may have appointed
for that purpose, that ten miles of said railroad have
been completed in a thorough and substantial manner;
which affidavit and report, together with the receipt for
said bonds, shall be filed in the office of the Secretary of
State; *provided*, that no bonds under this act shall
be issued to said company until it shall have completed
at least twenty miles of said railroad, whereupon said
bonds shall be issued and delivered 'for that amount of
said railroad, and thereafter for every ten miles, accord-
ing to the terms and conditions of this charter. The
Comptroller of the State shall cause to be assessed a tax
upon all taxable property, real and personal, in the State,
and upon all occupations, proportioned to the taxes
levied by general law on such property and occupations,
a sum sufficient annually to pay the accruing semi-annual
interest on said bonds, and two per cent. as a sinking
fund; which said sum shall be assessed and collected,
and deposited in the treasury of the State, subject to the

order of the Governor, to meet the payment of the inter-
est coupons and the principal of said bonds as soon as,
and whenever the same shall become due ; *provided*, that
no greater tax shall be assessed and collected by authori-
ty of this section than may be needed from time to time
to pay said interest and sinking fund."

In the petition of the appellee it is represented that
the International Railroad Company is a body politic
and corporate, created and established under said act;,
that there was granted to said company the right to con-
struct and own a railroad, and to maintain the same,
across the State of Texas, and upon a line designated in
said act; that after being duly organized the said com-
pany raised the necessary means and completed fifty-two
miles of railroad and fully equipped the same within the
time required by said act; that the same was duly re-
ported to the Governor, who thereupon appointed two
persons as agents of the State to examine and report
upon the work; that it appeared from the sworn state-
ment of the chief engineer of said company and the re-
port of said agents that said fifty-two miles of railroad
work was of a superior quality, and was in full compli-
ance with the requirements of said act ; that thereupon
the said Governor, under said 9th Section of said act,.
caused five hundred bonds of the State of Texas, each.
for the sum of $1000, to be prepared, the same having
coupons attached and to run for thirty years ; that the
said Governor signed said bonds, and transmitted them
to the Treasurer, who also signed them; that when the
same were transmitted by the Treasurer to the Comptrol-
ler, he failed and absolutely refused to countersign and
register the same ; that it was the duty of said officer un-
der said 9th Section to countersign and register said
bonds (a copy of one of the bonds and a coupon attached
being brought into court); that said company has no
other remedy but that which can be afforded by the writ

of *mandamus* commanding the said Comptroller to countersign and register said bonds, and thereupon a peremptory *mandamus* is prayed for at the hearing in the District Court.

There were general and special demurrers to the petition, and an answer to the merits by the defendant. After the several demurrers were overruled, a trial was had on the facts ; and upon a jury verdict judgment final was rendered against the defendant. There was also an intervention by the State of Texas, but as the same has been abandoned no further notice need be taken of it.

The questions which first properly come up for consideration by the court, and which have been fully and ably discussed by the counsel, arise upon the demurrers, and are these:

1. Does the record present a proper case for a *mandamus*, considered on general principles ?

2. Has the District Court the power and authority to compel the Comptroller of the State of Texas to countersign and register the State bonds ?

It is unnecessary to give an account of the origin and use of the writ of *mandamus* in England. It has been more or less employed in all the courts of America for many years, and the principles applicable to its use have been much discussed. It is sufficient to say that the proceeding by *mandamus* has for its object the enforcement of a duty, and that it has ever been regarded as an extraordinary remedy, subject to important restrictions. A *mandamus* will issue to an officer of the government only when the duty to be performed is ministerial in its character ; and when a duty is imposed upon the officer requiring the exercise of judgment or discretion a *mandamus* will not lie. (5 Texas, 478; 12 Pet. R., 524, 609; 7 Cr. R., 504; 6 Wheat., 598; 6 How., 92.)

It was said by Justice Wheeler : " The distinction between ministerial and judicial and other official acts

seems to be, that when the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial; but when the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial. (5 Texas, 479.)

This, perhaps, defines the rule as clearly as it can be done, yet it must be admitted that the use of terms handed down from a country where a different government and different laws obtain is calculated to make it difficult of application to particular cases. The word "ministerial" has reference generally to an act done under authority of a superior; and in this sense it could never apply to the chief executive with respect to anything required by the legislative authority. The word "discretion" strictly applies to but few acts. The Governor has a discretion in the exercise of the pardoning power, and sometimes a court in determining the amount of a fine; but the instances are few indeed where an officer, executive or judicial, in exercising the functions of his office is left to act solely at his discretion. "The discretion of a judge is said to be the law of tyrants." (Bouvier.) So also the word "judgment" most generally has reference to some determination by a judicial tribunal. It is evident, then, that these words are not to be used in a restricted sense. Where the line of demarkation lies between a ministerial act and an act involving the exercise of judgment is not always easy to determine. In the case of Decatur v. Paulding, 14 Peters, 518, Justice Catron said: "Any sensible distinction applicable to all cases it is impossible to lay down; such are the refinements and mere verbal distinctions as to leave an almost unlimited discretion to the court. How easily the doctrine may be pushed and widened to any extent, the case furnishes an excellent illustration. The process of

reasoning adopted by those who maintain the power to assume jurisdiction is, that where a right exists by law to demand money of an officer and he refuses to pay the court can enforce the right by *mandamus*, and to ascertain the existence of the right it is the duty of the court to construe the law; and if by such construction the right is found and the refusal to pay ascertained to have been a mistake, then the officer will be coerced to pay out the money as a ministerial duty." This reasoning is then pronounced an assumption which cannot be recognized.

In this case it is contended, that under the 9th Section of the act incorporating the International Railroad Company, the part to be performed by the Comptroller of the State, to-wit, countersigning and registering the bonds, is a mere clerical or ministerial duty, in regard to which nothing is left to his discretion or judgment. There is discretion or judgment to be exercised somewhere, and by some person or persons; for it is expressly provided "that no bonds shall be issued to said company until it shall have completed at least twenty miles of said railroad," etc.; and in the 13th Section of the same act it is provided that "the railroad of said company shall be thoroughly and substantially built; its iron rails shall be of weight not less than fifty pounds," etc. It is evident that the sworn statement of the engineer and the report of the agents were intended to furnish evidence only upon which the proper tribunal might act. It is said that this tribunal is the Governor; but it is difficult to see wherein the authority to decide is granted more to him than to the Treasurer or Comptroller. The injunction is, that "no bonds shall be issued" until a given amount of railroad work is completed, whereupon " the *bonds shall be issued* and *delivered*," etc. Now, there is a separate provision requiring that the bonds be delivered by the Governor to the president of the company after they are

executed ; why, then, use the expression "issued and de-
livered" in this prohibitory clause? If by issued was in-
tended only delivery, what would prevent the execution of
the bonds and the accumulation of interest thereon long
before the determination upon the work and the delivery?

It is more reasonable to conclude that the prohibition
of the issuance of the bonds included also their execu-
tion ; and that, as it is necessary for the Governor, Treas-
urer and Comptroller to participate in their execution, it
is the duty of each one to see to it that the proper and
necessary work is first performed ; when, if in their judg-
ment the law should be complied with by the company,
the proper bonds could be issued, and by the Governor
delivered to the company. The three highest executive
officers of the State are brought to this work, involving a
large financial operation, and it is evident that they are
jointly and severally charged with the duty of protecting
the interests of the State, involving more than can be
properly said to be a mere clerical or ministerial duty.

Again, the act of countersigning and registering the
State bonds by the Comptroller, as provided for by the
law in this case, is an official act pertaining to one of the
principal executive departments of this State, and neces-
sarily calls for the exercise of judgment. It is believed
that this position is well sustained by the best authorties.

In the case of Decatur v. Paulding, 14 Peters, 515,
which was a proceeding for *mandamus* against the Secre-
tary of the Navy of the United·States to enforce the pay-
ment of a half pension fixed by a special law of Congress,
Chief Justice Taney, delivering the opinion of the court,
said : "The duty required by the resolution was to be
performed by the head of one of the executive depart-
ments of the government in the ordinary discharge of his
official duties. In general such duties, whether imposed
by act of Congress or by resolution, are not mere minis-
terial duties. The head of an executive department of

the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. . He must exercise his judgment in expounding the laws and resolutions of Congress under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney-General to assist him with his counsel ; and it would be difficult to imagine why a legal adviser was provided by law for the heads of departments unless their duties were regarded as executive, in which judgment and discretion were to be exercised.'' The court cannot "by *mandamus* act directly upon such officer, and guide and control his judgment or discretion in the matters committed to his care in the ordinary discharge of his official duties.''

The same doctrine was distinctly announced in the case of Kendall v. The United States, 12 Peters, 610, a leading case on this subject. The court then said : "The *mandamus* does not seek to direct or control the Postmaster General in the discharge of any official duty,'' etc. And it was held in that case that "all room for the exercise of any discretion, official or otherwise, was shut out by the direct or positive command of the law,'' etc.

The same principle is still more strongly stated in the later case of the United States v. Guthrie, 17 Howard, 303, when Justice Daniel, in delivering the opinion of the court, said : "It would occur *a priori* to every mind that a treasury not fenced round or shielded by fixed and established modes and rules of administration, but which could be subjected to any number or description of demands, asserted and sustained through the undefined and undefinable discretion of the courts, would constitute a feeble and inadequate provision for the great and inevitable necessities of the nation. The government, under such an absence of all rule, would, if practicable at all, be administered, not by the great departments ordained by the constitution and laws, and guided by the

modes therein prescribed, but by the uncertain and perhaps contradictory action of the courts in the enforcement of their views of private interests." The same court then proceeds to say that, "The power of the courts of the United States to command the performance of any duty by either of the principal executive departments, or such as is incumbent upon any executive officer of the government, has been strongly contested in this court, and in so far as that power may be supposed to have been conceded, the concession has been restricted by qualifications which would seem to limit it to acts or proceedings by the officer not implied in the several and inherent functions or duties incident to his office—*acts of a character rather extraneous, and required of the individual rather than of the functionary.*" (See other authorities; 5 Texas, 479; Arberry v. Beavers, 6 Texas, 466.)

The Constitution of the State of Texas expressly names the Comptroller of Public Accounts as an executive officer of the government. (Art. 4, Sec. 1.) It assumes to define the powers and duties pertaining to his office. (Art. 4, Sec. 20.) "He shall superintend the fiscal affairs of the State; keep all the accounts of the State; audit all the claims against the State; draw warrants upon the Treasurer in favor of the public creditors, and perform such other duties as may be prescribed by law." It provides that the Treasurer of the State "shall receive and take charge of all public money paid into the treasury; countersign all warrants drawn by the Comptroller; pay off the public creditors upon the warrant of the Comptroller," etc. (Sec. 21.) It also provides that the Attorney-General shall give legal advice in writing to all officers of the government. (Sec. 23.)

The control and management of the fiscal affairs of a government is of the very highest importance. This power is given to the Comptroller. "He shall superintend," which includes the power of *directing* under the

36

law. True, he must "perform such other duties as may be prescribed by law," but only such as are in conformity with the Constitution, and are compatible with his powers under it.

The Comptroller being thus placed at the head of the fiscal department, clothed with the power of directing the same, and entitled to bring to his aid able counsel, surely it was intended that in all matters pertaining to the duties of his office, under the Constitution, he should exercise judgment and discretion.

To countersign and register State bonds would manifestly be an official act, and one pertaining to his general duties under the Constitution; for that done, and the bonds would stand as audited and perfected claims against the government, and would perhaps operate as warrants on the Treasurer.

Furthermore, the Comptroller should determine, before countersigning and registering the bonds, whether they in all respects conform to the law; and should consider also the different provisions of the law as they relate to his obligations under the Constitution.

1. The bonds presented to him in this case, as appears from the record, are made payable in the city of New York, so also the coupons; when the act of incorporation provides *only* that *the coupons* should be made payable in that city.

2. The act provides that he shall assess a tax on all the taxable property in the State, to meet the accruing interest on said bonds and to raise a sinking fund; when no tax for that purpose appears to have been levied by the legislative authority.

3. The act provides that the fund raised by taxation, and deposited in the treasury, shall be subject to the order of the Governor to meet the payment of the debt; when by the Constitution the superintendence and direction of all the fiscal affairs are given to the Comptroller.

All these and more are proper matters for the exercise of judgment, both upon the facts and in expounding the law, by an officer, touching the duties of his office, and with reference to a subject of such vital interest to the State. If, then, it is considered by the courts of the United States that the heads of the executive departments, created by law only, and not by the Constitution, are authorized to expound the law, and that the general duties pertaining to their office are not ministerial, is there not a greater reason for the rule as applied to an executive officer of this State, holding his trust directly from the people, and whose office is created by the Constitution, with its powers expressly defined therein?

Again, "to entitle a party to this remedy by *mandamus* he must show a clear legal right in himself, and a corresponding obligation on the part of the officer; for if the right or the obligation be doubtful, the court will not interfere by this process." (Arbery v. Beavers, 6 Texas, 473.) The fact alone that the bonds were made payable in New York, when the law does not authorize it, would show no obligation on the part of the Comptroller to countersign them.

*Second.* It is considered that the District Court has not the power and authority under the Constitution to compel an officer of the executive department of the government to perform an official duty. This conclusion must follow from the structure of our government, and the distribution of power under the Constitution between the three independent departments of government.

This question was first raised and elaborately discussed in the United States Court, in the case of Kendall v. The United States, before referred to. And in the opinion of the court it was announced that, "The theory of the Constitution undoubtedly is, that the great powers of the government are divided into separate departments; and so far as these powers are derived from the Constitution, the

departments may be regarded as independent of each other." (12 Peters, 609.) In the same case Chief Justice Taney, delivering a separate opinion, declined to discuss the question, saying that "the office of Postmaster General is not created by the Constitution, nor are its powers or duties marked out by that instrument. The office was created by act of Congress, and it may limit its powers and regulate its proceedings." (12 Peters, 625.) It is noticeable, however, that the court in its ruling in that case, and in all the cases since that time touching the subject, has disclaimed any interference with the powers and official duties properly appertaining to the heads of the executive department of the government. (14 Peters, 515; 17 How., 303; 6 Wheat., 349.) This right of interference was expressly disclaimed by the court, as before shown, in the case of the United States v. Guthrie, 17 Howard, 303, and it was then said that whenever the court has assumed to exert its power against any executive officer, it was only as "to acts of a character extraneous and required of the individual rather than of the functionary." (17 Howard, 303.) It would seem that where a want of power in the courts to enforce a *mandamus* against a high executive officer has not been conceded, nearly the same end has been practically reached by a liberal construction as to the judgment and discretion necessary and proper to be exercised by such officer.

The question may be said to have been authoritatively settled in this State under the Constitution of 1845, in the case of the Houston Tap and Brazoria Railroad Company v. Randolph, 24 Texas, 335. The opinion appears to have been rendered after a contest showing research and ability, and by a full court. The following quotation from the opinion is here made, to-wit:

"The 2nd Article of the Constitution provides that 'the powers of the government of the State of Texas shall be divided into three distinct departments, and each

of them be confined to a separate body of magistracy, to-wit, those which are legislative to one, those which are executive to another, and those which are judicial to another; *and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others,* except in the instances herein expressly permitted.' Here is a direct prohibition of the blending of the departments. It contemplates that the persons employed in each department will be wise enough and honest enough to discharge the duties entrusted to them without the aid or interference of the others. And it is a full warrant for each department to disregard and repel such interference; for, as before said, each one of these departments acts under a delegated limited authority, and if one exceed its authority by usurping powers not belonging to it, its act is a nullity, not binding the other departments, and may be totally disregarded by them. If the Governor were to dictate to the judges the judgment to be pronounced, and enforce obedience by his power over the militia, the usurpation would be startling indeed, and too plain for discussion. Not any more so in principle, however, than for the District Court of Travis county, or the Supreme Court of the State, to require by its mandate that the Governor of the State shall sign a patent to land, or the Comptroller shall audit an account, or the Treasurer of the State shall pay a draft upon the treasury."

Since that ruling was published two constitutions of the State of Texas have been made (that of 1866 and that of 1869), and the same inhibition as to the exercise of power by persons of the different departments of government is retained, and doubtless with a full knowledge of the ruling of the court on this important question. And, as if it were intended by the framers of the Constitution now in force to leave no room for judicial construction, that instrument is made to expressly define the different ex-

ecutive offices which constitute the executive department, one of which is the Comptroller of Public Acccounts. (Art. 4, Sec. 1.) And with reference to the Comptroller, among others, it expressly defines his powers and marks out the line of his duties (Art. 4, Sec. 20), which was never done before in any Constitution of this State. It is observable, also, that whereas under the old Constitution the supreme executive power was vested in the chief magistrate, under the present Constitution it is vested in the entire magistracy composing the executive department, with the powers of each separately defined. Are all these changes meaningless? Surely not. They must have been intended to more clearly define the boundaries of power between the three great departments of the government, and also between the different offices composing the executive department.

These considerations furnish additional and very strong reasons why the court should adhere to the ruling made in the above case of the Houston Tap and Brazoria Railroad Company v. Randolph.

In the different States of the Union the executive power is vested in the Governor, while in this State, as before stated, it is vested in the magistracy composing the executive department. The authorities are numerous sustaining the independence of the executive department. (Dennett, Pet., 32 Maine, 508; Mauran v. Smith, 8 R. I., 192; State v. The Governor, 1 Dutcher, N. J., 331; Law v. Towns, 8 Ga., 360; Hawkins v. The Governor, 1 Ark., 570.)

If there is no other remedy than by *mandamus* against the Comptroller for the non-performance of official duties, the same could be said of the Governor, and of a judge of the court. It is as reasonable to suppose that one officer would act up to the performance of duty as faithfully as another. Evidently this independence of power in the different departments was intended to act as a check and restraint against usurped authority.

The decisions of the Supreme Court of this State are relied on as authority in support of the jurisdictional right of the court to award a peremptory *mandamus* in this case. It may be well to determine the weight of such authority by examining into their origin and history. First, it must be considered that a petition for a writ of *mandamus* has never been sustained in this State against the Governor, Secretary of State, Comptroller, Treasurer, or Auditorial Board, though many have been filed and prosecuted. They have been sustained against the Commissioner of the General Land Office in very few instances —perhaps three or four out of the numerous cases wherein it has been attempted. (Horton v. Brown, 2 Texas R., 78; Ward, Commissioner, v. Townsend, 2 Texas R., 581; H. & G. N. R. R. Co. v. Kuechler, 36 Texas R., 382.)

In the first case, the suit above referred to was between two claimants, and the writ was incidental. In the second, there was no statement of facts, and the rule was adopted that "in their absence the legal intendment is in favor of the correctness of the judgment." In neither of the two first cases referred to was the question of the right to the writ argued by counsel, or discussed by the court. The early cases afterwards determined by this court, in which the principles were enunciated as applicable to the remedy by writ of *mandamus*, were cases in all of which it was held that the writ could not be sustained. And the principles announced were assumed to be drawn mainly from the decisions in these two cases, and from the decisions of the Supreme Court of the United States upon that subject. (Glasscock v. Commissioner General Land Office, 3 Texas, 53; Bracken v. Wells *et al.*, 3 Texas, 90; Commissioner General Land Office v. Smith, 5 Texas, 477; Arberry v. Beavers, 6 Texas, 464, and others.)

The rule announced by Justice Wheeler in delivering the opinion of the court in the case of Commissioner

General Land Office v. Smith, as the conclusion thus arrived at, was that "a *mandamus* may issue to compel the Commissioner of the General Land Office to issue a patent *when it shall have been made to appear to the court* that the right of the party is clear." (5 Texas, 480.) Thus holding that, however complex the facts, or confused the law in the construction of it, when, after investigation *in a court*, the right is made to appear to be clear, the writ of *mandamus* would issue. That this was the exact position assumed may be seen by reference to his opinion in 5 Texas, 479. This, it is believed, extended the remedy far beyond the decisions quoted from the Supreme Court of the United States. Indeed, it has been held by that court that a *mandamus* could not issue against the Commissioner of the General Land Office of the United States, in a case wherein there were complex facts to be examined into, requiring judgment, and which "calls for the exercise of the judicial functions of the officer." And upon the question as to whether a *mandamus* can be issued in any case against the Commissioner, it is said in that opinion, "we have found no case in which this power has been exercised. Patents are to be signed by the President in person, or in his name by a secretary, under his direction, and countersigned by the recorder of the General Land Office." (United States v. The Commissioner, 5 Wall., 565.)

It must be recollected that this remedy was introduced in Texas mainly as an incident to suits between private litigants in the different counties of the State, which caused a statute to be passed requiring such suits against the heads of departments or bureaus to be brought in Travis county. (Act of 1846, Hartley's Digest, Art. 643, p. 237.) However such act may have recognized the legality of such suits, it could not be held, either in its terms or by implication, to have enlarged and extended the remedy by *mandamus* beyond the enforcement of a merely minis-

terial act by any of such officers, while they were regarded as high executive officers of the State. (5 Texas, 478.)

It must be considered, also, that the office of Commissioner of the General Land Office, previous to the Constitution of 1869 (which made it a constituent portion of the executive department), was a mere commission to aid in perfecting and preserving land titles, and that the Commissioner was regarded and treated by the courts as merely a ministerial officer, whose office was created and shaped, and whose duties in said office were prescribed, entirely by the acts of the Legislature, and all of whose official acts and determinations, whether involving the exercise of judgment or not, were subject to be enquired into in a suit by *mandamus*. (Norton's S. v. The Commissioner, etc., 2 Texas, 362; Com. G. L. O. v. Smith, 5 Texas, 479–80; Glasscock v. Com. G. L. O., 37 Texas, 53.) The limitations of the remedy to purely ministerial acts, as announced in the decisions of the Supreme Court of the United States (in 1 Cranch, 12 and 14 Peters, 6 Wheat., 6 Howard, 5 Wallace), though quoted as a basis, were never practically applied to the Commissioner in any of the decisions as it was applied to the acts of the heads of departments in the government of the United States. It must be observed, also, that none of those decisions in reference to the Commissioner consider or discuss the question of the division of the powers of government—treating the Commissioner as part of, or subject to, the executive department of the government.

The last case, wherein the writ was issued to the Commissioner, though decided since the Commissioner has been made a constituent portion of the executive department of the State by the Constitution of 1869, is rested upon previous decisions and general principles. (Railroad Co. v. Commissioner, 36 Texas, 382.)

Under the view here presented, it is not perceived that the decisions relating to the Commissioner of the General

Land Office can be of any great weight of authority in this case.

At the late session of the State Legislature a compromise act, or act of adjustment, with the International Railroad Company was passed, and other questions have been presented for our consideration as if an adjudication thereon was contemplated by said act. There is a provision in the act that the same shall not be considered as in any way interfering with the litigation in this case. Moreover, there is no expression recognizing the State of Texas as a party to the suit. It having been already decided that the court has no jurisdiction over this case, any further opinion on the questions presented would be extra-judicial and without authority.

For the reasons given, it is considered by the court that the judgment of the court below be reversed and that the cause be dismissed.

REVERSED AND DISMISSED.

REEVES, ASSOCIATE JUSTICE, *dissenting.*—I dissent from the opinion of the majority of the court, and propose to present my views on the questions discussed in the opinion.

The act of the Legislature making the decision of this court the basis for a settlement obviously contemplated as a contingency a decision on all the questions touching the merits of the controversy as made by the pleadings. I think the case as it is presented by the pleadings is properly before the court for that purpose—if not with the consent of the State, certainly without its objection. The majority of the court think otherwise. From that view of the matter I dissent. Had it not been decided in Davis v. Gray, 16 Wallace, 203, that making a State officer a party does not make the State a party, it might still be contended that the same result would follow when the State, after having intervened, afterwards voluntarily

withdrew and ceased to be a party to the litigation, and that the State did not object to the prosecution of the suit as originally instituted against the Comptroller.

The jurisdiction to enquire into the power of the Legislature to pass an act, and to decide whether the enactment is constitutional or not, has never been denied to the courts, and its exercise has never been regarded as encroaching on the powers properly belonging to the other branches of the government. The validity of the act does not depend upon the motives which may have induced its enactment. Such a test as that has never been applied, and when the effort has been made the courts have refused to interfere, having no jurisdiction over the subject. If the act was passed by the Legislature, and received the approval of the Governor, the only question that can arise is whether the Legislature had the power under the Constitution to pass it. If it had, the enactment is binding alike on all the departments of the government. This is not a new question, and requires no extended argument for its support, if former adjudications are to be followed; and nothing more is necessary than to cite the authorities which are thought to be conclusive on the point and referred to in the briefs of counsel for appellee. (Wright v. Defrees, 8 Ind., 298; *Ex Parte* Newman, 9 Cal., 502; Johnson v. Higgins, 3 Met., Ky., 566; People v. Draper, 15 N. Y., 545; Sunbury and Erie Railroad Company v. Cooper, 33 Penn. St., 278.)

If the jurisdiction of the courts to pass upon the constitutionality of a law be admitted, it is not readily perceived upon what principle an officer of the government (no matter to which department he may be attached) could disregard the sentence and be heard to assert that he was not bound by the obligation it imposes, unless he is prepared to advance a step further and declare his independence of the law itself, though the duty was only

ministerial. That would be the result of the doctrine contended for.

The Comptroller does not rest his defense upon that ground, but says it is a case for the decision of the court, as will be seen by his letter to the Governor declining to countersign and register the bonds without the slightest intimation that he regarded his action as final.

The right to issue the writ of *mandamus* in a proper case finds ample support in the practice of this court as shown by the following cases, and others might be cited: Ward, Commissioner of the Land Office, v. Townsend, 2 Texas, 581; Glasscock v. Commissioner of the General Land Office, 3 Texas, 51; Commissioner of the Land Office v. Smith, 5 Texas, 471; Meyer v. Carolan, 9 Texas, 250; Arberry v. Beavers, 6 Texas, 457; Horton v. Pace, 9 Texas, 81.

This question was not regarded as an open one as early as the decision in the case of the Commissioner of the General Land Office v. Smith, above cited. Justice Wheeler, in delivering the opinion of the court in that case, said: "The practice of resorting to this proceeding (*mandamus*) against this officer, and to enforce the performance of this particular duty, is believed to have had its origin almost as early as the creation of the office itself, and to have been continued, without a question as to its legality, down to the present time" (1849). In Meyer v. Carolan, Chief Justice Hemphill, in vacation, had issued an alternative *mandamus* against Carolan, as clerk of the District Court, to approve an appeal bond and compel him to send up to the Supreme Court a transcript of the record in the case. Justice Lipscomb, in delivering the opinion of the court, said: "The clerk is required to take and approve an appeal or writ of error bond, and send up to this court a complete transcript of the record of the case as it is of record in the District Court. If, after taking the bond, the clerk should fail or

refuse to send up a transcript of the record, the writ of *mandamus* would lie, because he would have exercised and discharged the only discretion reposed in him by law, and what remained—the sending up a transcript of the record—would be purely a ministerial act, in which he would have nothing to exercise his judgment upon."

The distinction between a ministerial act and one of judgment is clearly shown in this case. The sufficiency of the security was a question of fact to be passed upon by the clerk, in which the exercise of his judgment was. required, and the performance of that duty could not be compelled by *mandamus*. The sending up the transcript was an act defined and enjoined by law, without consulting either his discretion or his judgment; and, therefore, a proper case for the writ. Other cases might be cited in which the right to issue the writ is not questioned, but. was refused because the applicant failed to show that he was entitled to it on the facts of his case, but the references here made will suffice on the practice of the court..

The right to issue the writ does not rest alone on the practice of the courts of this State. It is recognized by the Legislature and all departments of the government, and the practice is in harmony with the decisions of the courts of other States and of the United States.

By the act to organize the District Courts, and to define their powers and jurisdiction, the judges have author-ity to grant writs of *habeas corpus*, *mandamus*, injunction, sequestration, error and *supersedeas*, and all other remedial writs known to the law; providing, that all writs of *mandamus* sued out against the heads of any of the departments or bureaus of government shall be returnable before the District Court of the county in which the seat of government may be. (Article 1407, Paschal's Digest.) The statute of 1841 contained a similar provision. The only limitation on the power to grant the writ is, that it must be returnable at the seat of government. It is not re-

stricted to cases against the Commissioner of the Land Office; it is general, and applies to any of the heads of departments. "It lies" (said the court in the case of the Commissioner of the Land Office against Smith) "as a private remedy to compel the heads of departments to perform a duty in cases where the duty is plain, and where there is no discretion," and where the duty is ministerial in its character. Parties whose rights are affected must be made parties in a proceeding by *mandamus*, is the uniform decision of this court—a lifeless form, on the supposition that the court cannot redress the wrong. The heads of departments are public officers, and their offices are created by the Constitution, and I see no good reason why the Comptroller should be excepted out of the provisions of a general statute, applying in its terms not less to him than to others sustaining to the government the relation of public officers. I find no good reason why a suitor should be denied redress, if he shows himself to be entitled to it, on a proper application invoking relief when it has been denied him by the Comptroller, and when it would be granted if refused by the Commissioner or other officer of the government. In England this process is called a prerogative writ, by way of distinction from writs of common right, and because it relates to the public and the government. It issues out of the Court of King's Bench, to compel performance of an act enjoined by law, and for which there is no other adequate legal remedy. In modern practice it is not regarded as a prerogative writ, and it is nothing more than a suit or action at law between the parties in cases where it is the appropriate remedy. Regarded as a suit or action, it is embraced in the grant of jurisdiction given to the District Court "of all suits, complaints and pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at or amount to one hundred dollars."

In delivering the opinion of the court in Kendall against Stokes *et al.*, 3 Howard, 100, Chief Justice Taney said: "The remedy in that form (by *mandamus*) originally was not regarded as an action by the party, but as a prerogative writ, commanding the execution of an act where otherwise justice would be obstructed, and issuing only in cases relating to the public and government, and it was never issued where the party had any other remedy. It is now regarded as an action by the party on whose relation it is granted, but subject still to the restriction that it cannot be granted to a party where the law affords him any other adequate means of redress." (Kendall v. The United States, 12 Peters, 615; Commonwealth of Kentucky v. Dennison, 24 How., 97; Marbury v. Madison, 1 Cranch, 49 and 137; The People v. Secretary of State *et al.*, 58 Illinois, 90; Auditor of Marion v. The State, 3 Indiana, 452, Porter; The People v. Edmonds, 19 Barbour, 472.)

The duty imposed upon the Comptroller in this case is defined and enjoined by law, is ministerial in its nature, and does *not* involve the exercise of judgment or discretion. The ninth section of the charter provides "that said bonds shall be signed by the Governor and the Treasurer of the State of Texas, and countersigned and registered by the Comptroller, with the seal of the State of Texas affixed thereto, and shall be delivered by the Governor to the president or such other officer of said company as shall be specially appointed to receive and receipt for the same, on the sworn statement of the chief engineer of said company, and the written report of such officers or agents of the State as the Governor may have appointed for that purpose, that ten miles of said railroad have been completed in a thorough and substantial manner, which affidavit and report, together with the receipt for said bonds, shall be filed in the office of the Secretary of State; *provided*, that no bonds under this act shall be issued to

said company until it shall have completed at least twenty miles of said railroad, whereupon said bonds *shall be issued and delivered* for that amount of said railroad, and thereafter for every ten miles, according to the terms and conditions of this charter."

The duty here enjoined on the Comptroller is clearly defined, and is a clerical or ministerial act, referring nothing to his judgment or discretion, only requiring him to countersign and register the bonds. The bonds are to be delivered by the Governor; the officers or agents of the State to examine the road are appointed by the Governor; the affidavit of the engineer and report of the agent so appointed, with the receipt for the bonds, must be filed in the office of the Secretary of State; and the seal of the State, of which the Governor is the keeper, must be affixed to the bonds—all to be done without the agency, and certainly without any discretion, of the Comptroller.

The authority of the Comptroller to superintend the fiscal affairs of the State is enjoined as a duty, and is not a power to be exercised at his discretion without warrant of law. The Legislature may direct the manner of its exercise, and require him to perform such other duties as may be prescribed by law appertaining to the duties of his office, and not inconsistent with the Constitution. If the duty is ministerial, and he refuses to comply, it is a case for a *mandamus;* but not, if he is authorized to exercise his judgment or discretion. The appropriation of money for purposes of internal improvement, and the payment of the interest and principal in the future, and providing adequate means for that purpose, come within the scope of legislative power, over which the Comptroller has no discretion; and it is not within the scope of his general duties relating to the fiscal affairs of the State. Where the appropriation is specific, the Comptroller cannot divert it and apply it to a different object, and he would have no control over the fund, and could exercise

no discretion in regard to it; nor can he order the payment of money without authority of law. (Article 4, Section 20, of the Constitution; Article 12, Section 6 and Section 23.)

The question whether the Comptroller could properly assess the tax without a levy was not the ground of the application for the writ, and that question may never arise. The compromise act, as it is called, provides for the levy if the decision should be for the company on the merits. This I think invites discussion on other questions left undecided in the opinion, and which should be met and disposed of. But as that is not done, I shall not discuss them, resting my opinion on the questions I have indicated.

DEVINE, ASSOCIATE JUSTICE, *dissenting.*—This case came before this court on appeal by A. Bledsoe, as Comptroller of the State of Texas, from a judgment or decree of the District Court of Travis county, on a petition for *mandamus* commanding him to countersign and register certain bonds, claimed by the International Railroad Company, and fully described or set forth in their petition.

The dismissal of the cause for want of jurisdiction by the majority of this court led to a dissent on the part of two members. Justice Reeves has expressed his views in an opinion in which I concur, and I have considered it proper to express at length my opinion, and refer to some of the authorities that have led, in connection with those cited by Judge Reeves, to the formation of that opinion.

The importance of the question at this time, when viewed in the light in which it is placed by the opinion delivered, is greater than perhaps it at first view appears either to the public or the legal profession. Important not alone by reason of the tax necessarily required to pay

37

the interest and principal upon the several millions of indebtedness from which the decision has apparently relieved the taxpayers of the State, or by the failure of the company to obtain a decree of the court in its favor, which would entitle it, under its contract with the State, to a partial compensation for the money expended in the construction of a great public highway nearly two hundred miles in extent, one-half the distance between the eastern and western boundaries of the State. Nor is the case alone important from the fact that this judgment deprives the company of the only known legal remedy by which its rights in the subject matter of the suit can be ascertained, determined and enforced.

There is another view of this case, and the question is of far more importance than the rights of any one individual or corporation embraced in this suit, or the release of the people from any amount of taxation likely to be cast on them. The question presented by the judgment and in substance declared in the opinion of the court is, that the members of the executive department of the government (not alone the Governor and Lieutenant Governor, but the Comptroller of Public Accounts, the Treasurer, the Commissioner of the General Land Office, the Attorney-General, the Secretary of State, and the Superintendent of Public Instruction) are, each and all, in matters relating to their official duties, not subordinate to and bound by the laws which the Legislature may enact for their guidance and control; but if, in the opinion of any such official, the law does not harmonize with his view of the Constitution, or of expediency, or from any other cause, whether mere whim, caprice, official insolence, or reasons of a private or personal character, he may with impunity follow the bent of his inclinations; that he cannot be coerced into an obedience of the law by the court, being authorized by express statute to act by reason of the fact that each and all of the officers above

named are styled in the Constitution of 1869 "of the Ex-utive Department" of the State.

This portion of the opinion justifies the statement that the judgment and opinion draw after them consequences infinitely more important than those embraced in the pleadings of the parties to this suit.

To the judgment rendered and the opinion delivered I cannot yield my assent. I am unable to comprehend how, under our form of government and the line of decisions of our own court, the Supreme Court of the United States, and those of our sister States, there is in any branch of the executive department of this State a power to refuse or fail to act in a case where there is a plain, positive, peremptory constitutional enactment *requiring* action by an officer or officers. To hold that there is such power in an officer of this character, in view of the law and precedents, is in effect admitting that a citizen having a clear legal right, with a channel through which his rights could flow to him, as indicated by law, should, nevertheless, from the mere will of an officer directed to set his right in motion, or give him evidence of it, have his right obstructed, delayed, or forever lost to him. It will be admitted that if the Comptroller can (as in this case it is declared he can) set aside a plain and positive requirement of the law on the plea that his legal adviser, the Attorney-General, advises him he ought not to act, then he may, and so may every other officer of the executive department, disregard with impunity any other act of the Legislature that in his opinion or that of his legal adviser interferes with his official duties, or, as was said in this case, is "unconstitutional, oppressive, or unjust in its workings." To admit this would be an acknowledgment that the final adjudication of a constitutional question rests with the officer or with the Attorney-General and not with this court.

This I cannot assent to, as it would create an irrespon-

sible power in those officers that was not intended by the framers of the Constitution ; a power defiant of law and above judicial inquiry; a power before which the citizen would be powerless, and in whose presence the judicial power of the State would stand impotent, emasculated, and paralyzed, unable to declare a rule, or enforce a mandate.

I believe the decision in this case has mistaken the law, has overlooked precedents, and is not in harmony with our system of government or laws.

In the opinion of the majority of the court it is said, "A *mandamus* will issue only when the duty to be performed is ministerial in its character ; and when a duty is imposed upon an officer requiring the exercise of judgment or discretion, a *mandamus* will not lie."

In the case before the court a ministerial act was required of the Comptroller, and nothing more. His duty under the law was to countersign and register the bonds— no judgment exercised or discretion permitted.

The opinion declares that "The word 'ministerial' has reference generally to an act done under authority of a superior, and in this sense it could never apply to the chief executive with respect to anything required by the legislative authorities."

In reply to this, the superior in the order to countersign and register the bonds was the legislative voice, speaking or ordering by the law of the land. As regards the executive, or its application to him in this case, it is sufficient to state that discretion was left by the act in the Governor ; none whatever in this matter was given to the Comptroller.

Again, this is a proceeding against the Comptroller; the Governor is not a party, and in no way interested in this suit more than any other tax-paying citizen of the State.

The opinion declares that " Where the line of demarka-

tion lies between a ministerial act and an act involving the exercise of judgment is not always easy to determine."

This is undoubtedly correct. In this case, however, I think the line of demarkation is so plain that "he, who runs may read," and being so plain, in my opinion, I have believed it proper to tread boldly on in the path so found, to its legitimate conclusion, when the rights of the State or the citizen required it.

Judge Ferris, in the opinion, states: "In this case it is contended that under the 9th Section of the act incorporating the International Railroad Company, the part to be performed by the Comptroller of the State, to-wit, countersigning and registering the bonds, is a mere clerical or ministerial duty, in which nothing is left to his discretion or judgment. There is discretion or judgment to be exercised somewhere, and by some person or persons, for it is expressly provided that no bonds shall be issued to said company until it shall have completed twenty miles of said railroad, etc.   *   *   *   It is evident that the sworn statement of the engineer and the report of the agents were intended to furnish evidence only upon which the proper tribunal might act.   It is that this tribunal is the Governor, but it is difficult to see wherein the authority to decide is granted more to him than to the Treasurer or Comptroller."

The authority given exclusively to the Governor to decide upon the character of the road, etc., and the number of miles completed, is found in Section 9 of the act incorporating the company, as likewise his exclusive authority to appoint or select the officers or agents of the State to examine and report upon the condition of the road previous to the issuing or delivery of the bonds. This section further shows that the purely ministerial act of the Treasurer in signing the bonds after the Governor, and the merely ministerial act of the Comptroller to countersign and register the bonds, has nothing to do with the

inquiry into the condition of the road, or the issuance and delivery of the bonds—the signing, countersigning and registering being all that either of these officers are even permitted to do, with reference to the question of the execution, issuance, or delivery of the bonds.

The opinion declares, "it is more reasonable to conclude that the prohibition of the issuance of the bonds includes also their execution, and that as it is necessary for the Governor, Treasurer and Comptroller to participate in their execution, it is the duty of each one to see to it that the proper and necessary work is first performed, when, if in their judgment the law should be complied with by the company, the proper bonds could be issued, and by the Governor delivered to the company."

The charter, when read, however, leaves us in no doubt as to the intention of its framers as to who should decide the question as to the propriety of issuing or delivering the bonds.

The execution of the bonds is one act; their issuing or delivery is an entirely distinct and separate act. The bonds may be executed, but may never be delivered. The issuance and delivery of a bond are almost synonymous terms. (See Webster's definitions of the words *issued* or *delivered.*) In fact, these terms are used in Section 9 of the act as the equivalents of each other, when it states the bonds "shall be delivered by the Governor to the president or such other officer of said company," etc.; and further, "*provided*, that no bonds under this act shall be issued to said company until it shall have at least completed twenty miles of said railroad, whereupon said bonds shall be issued and delivered for that amount of said railroad," etc. Hence it follows that the Treasurer and Comptroller being only required to sign, and the Comptroller to register, the bonds, they nor either of them have no more connection with the issuing or delivery of them than has the Commissioner of the General

Land Office. There is not a sentence in the law relative to the action of the Comptroller concerning the execution, issuance, or delivery of the bonds, save the *command* to countersign and register. He is not even made the keeper of the reports of the engineer or State agents, or the receipts for the bonds delivered. These papers are filed in the office of the Secretary of State.

It has been ably argued by the Attorney-General, on behalf of the Comptroller, that he is, by Article 4, Section 1, of the Constitution, named as an officer of the executive department in connection with the other officers there named; and the opinion of the court refers to this fact as extending to him some undefined immunity from the action of the courts in the enforcement of the law against him as an officer which was not enjoyed by his predecessors under the former constitutions of the State.

This constitutional declaration is nothing more than the statement of the merest truism. The Comptroller never, in our history as a Republic or State of the Union, belonged to, nor was he ever considered as belonging to, either the judicial or legislative departments of the government; he, as also all the other officers mentioned in Article 4, Section 1, were *always* considered, and in fact belonged to, the executive department of the government.

It has been contended that inasmuch as the Constitution declares in *general terms* the powers and duties of the Comptroller (although it lies with the Legislature to prescribe those duties), the Comptroller is practically independent of legislative direction, and that the words of the Constitution (after prescribing in general terms his duties), "and perform such other duties as may be prescribed by law," should not interfere with his judgment of what is best for the people of the State; that he is to *decide*, and if he thinks proper it is for him to *declare*, whether a positive law commanding the performance of a ministerial act shall be obeyed or not.

The argument seems to be of this character. If the Comptroller refuses to obey the law, he is exercising judgment or discretion; if he is exercising judgment or discretion, it must be a judicial and not a ministerial act; and being a judicial and not a ministerial act, that officer and all others belonging to the executive department of the State are governed not by the law, but by their views of what is most expedient.

Under this State of affairs the private citizen is remediless; the public interests can be trifled with or entirely disregarded; rights. the most important or sacred can be delayed or trampled down with impunity, because the courts cannot interfere with the failure or refusal of the official to act; the voice of the law cannot be heard and the arm of the law cannot strike; the one is dumb and the other paralyzed, in the presence of that sentence, "an officer of the executive department of the government." The opinion, it is true, does not in terms so declare, but the ideas thus expressed will be found in it.

The objections expressed in the opinion that the bonds are made payable in the city of New York, and the question as to the propriety of the Governor controlling the money so raised, can be briefly answered, so far as the question before the court is concerned; it will suffice to say that these questions were not presented in the pleadings of the appellant, neither are they nor either of them complained of or alluded to in the letter from the late Attorney-General to the Comptroller, and referred to in the answer of appellant; they are questions not raised in the case either in briefs or argument of counsel.

The opinion further declares, "*It is considered that the District Court has not the power and authority under the Constitution to compel an officer of the Exccutive Department of the Government to perform an official duty*. This conclusion must follow from the structure of our government, and the *distribution* of powers under

the Constitution between the independent departments of government," etc.

By official duty is meant (doubtless) some duty necessarily connected with the office, or authorized or commanded by law. The proposition embraced and the principle enunciated in the preceding paragraph quoted is laid down without qualification, reservation, or limitation, and unhesitatingly asserts that neither Comptroller, Treasurer, Secretary of State, Commissioner of the General Land Office, Attorney-General, or Superintendent of Public Instruction, can, even in the simplest ministerial duty, no matter how important or great the interests involved, be compelled by *mandamus* to obey a precise, positive law. This is investing these officers with an infallibility of judgment that renders law inoperative when its madates and their discretion meet in opposition.

It is stated in the opinion : " If there is no other remedy than by *mandamus* against the Comptroller for the non-performance of official duties, the same could be said of the Governor and a judge of the court."

The question has been so held with reference to judges that a *mandamus* will lie to compel a judge to proceed to judgment. In the case of a Governor being liable to *mandamus*, see Middleton v. Lowe, 30 California, 601, where the court held that the signing of a patent by the Governor was a purely ministerial act, and where the prerequisites to obtaining a patent existed a *mandamus* would lie; adding, that "The constitutional injunction ' that he shall see that the laws are faithfully executed' cannot change the character of a duty which the Legislature has seen fit to impose upon him ; for if the given duty is ministerial when it is required to be performed by any officer, it remains of the same nature though required of the chief executive officer of the State."

The Supreme Court of the United States has recently affirmed the same principle in the case of Davis v. Gray,

16 Wallace, 203, in the injunction granted by the United States Circuit Court of Texas, enjoining Governor Davis and the Commissioner of the General Land Office of Texas from issuing patents on surveys within the reservation set apart to the Memphis and El Paso Railroad Company. It is said in the opinion that "it must be considered that a petition for a writ of *mandamus* has never been sustained in this State against the Governor, Secretary of State, Comptroller, Treasurer, or Auditorial Board."

They have been sustained against the Commissioner of the General Land Office. *The power of the court to grant the writ has never been denied by the court whenever the facts of the particular case brought the complaint within the letter and reason of the law,* save in one solitary instance—Houston Tap and Brazoria Railroad Company v. Randolph, 24 Texas, 317—which, so far as the inability of the court to issue *mandamus* to the head of a department or bureau, has been subsequently overruled. See Railroad Company v. Commissioner, 36 Texas, 384, in which the court said: "*We can see no reason why the propriety of issuing the writ of mandamus in any proper case* to the Commissioner of the Land Office, or to any other officer of the State government, should ever have been brought into question;" the court adding, "there are cases in which the writ of *mandamus* is the only proper remedy for a right withheld."

In allusion to the act of the last Legislature respecting a compromise between the State and the company, it was said that "there is a provision in the act that the same shall not be considered as in any way interfering with the litigation in this case," and "that moreover there is no expression recognizing the State of Texas as a party."

To this it may be answered, that the act looked in its very nature and in its terms to a decision on the merits as the only decision to be considered of force and effect

in the compromise agreed to by the State and the company. Some of the ablest lawyers in the State were members of the Legislature that passed the compromise act ; their special attention was directed to this measure, and a feeling of great interest was entertained by those holding different views respecting the question presented ; it was known to all that a verdict and judgment had been rendered in the District Court of Travis county against the late Comptroller, and that the cause was pending in this court on appeal from the District Court.     It is therefore barely supposable that in view of the interest felt, and the discussions on this question in the Legislature, that that body would have passed this act in its present form unless it had been believed that this court could take jurisdiction, and it certainly was the desire, and I believe the intention is sufficiently expressed, that this court should pass on the rights of the State and the corporation by "a decision on the merits."    It is in effect a recognition of the State of Texas being interested in the question, and that her rights or liabilities should be determined by a judgment on the merits of the question.    A different construction would seem to imply that the Legislature deliberately passed an act involving the credit of the State and several millions of dollars to the interested parties in the controversy, to be decided by this court, and yet failed to express, and did not desire, that this court should make a decision in favor of or against either party on the merits of the case.

Passing from the opinion, I will refer to some of the principal cases where this court under the State, and the former Supreme Court under the government of the Republic of Texas, uniformly held the doctrine that a *mandamus* would lie to the head of a department or bureau to compel the performance of a clear ministerial duty and enforced that doctrine by a judgment of the court whenever the applicant showed such a state of facts as

brought him with a clear legal right before the court. This power so exercised had for its sanction a long line of precedents in the courts of that country from which we have derived the greater part of our system of jurisprudence.

The court had as precedents for its action the decisions of the Supreme Court of the United States and those of our sister States, and had in addition to these precedents the law of January 25, 1841, and the present law passed June 26, 1846. See Hartley's Digest, Article '643, wherein the authority is given to issue the writ by the District Court of the county where the seat of government is located, "*against the heads of any of the departments or bureaus of government.*"

· The cases referred to in the opinion, as showing a refusal to grant the writ, will be briefly referred to. The first in order is Glasscock v. The Commissioner of the General Land Office, 3 Texas, 53. In this case the applicant for the writ failed to show that his certificate, by virtue of which he claimed a patent, had been recommended for patent by the investigating board of commissioners, which was an indispensable prerequisite to the Commissioner issuing a patent, the court declaring in substance that the writ would issue to compel the performance of a duty clearly enjoined by law and ministerial in its character. The next case cited is that of Bracken v. Wells *et al.*, 3 Texas, 90.

This was a petition for *mandamus* to compel the surveyor of Gonzales county to survey on an invalid certificate. Chief Justice Hemphill states the case as follows: "A court cannot issue a *mandamus* to compel a public officer to perform an act *which is not clearly prescribed by law*, or to compel a surveyor to make a survey upon an evidence of claim which is prohibited by the law from being received as proof for that purpose."

This case is not opposed to the doctrine of jurisdiction.

The next case in order is the case of Smith v. The Commissioner of the General Land Office, 5 Texas, 480. In this case the court said: "We conclude that a *mandamus* may issue to compel the Commissioner of the Land Office to issue a patent when it shall have been made to appear to the court that the right of the party is clear, and that it has been refused by the Commissioner." The petitioner, Smith, did not bring himself within the terms of the law, so as to be entitled to a patent, other parties having prior claims to the land, and his prayer was therefore not granted.

The succeeding case referred to is the case of Arberry v. Beavers, 6 Texas, 464. In this case Arberry, as chief justice of Cass county, refused to receive or count the votes returned from several precincts in a contest between the towns of Jefferson and Linden, he alleging the returns were not made in accordance with law. On a petition for *mandamus* the District Court rendered judgment against him. On appeal to this court the judgment of the District Court was reversed, on the grounds that petitioners had omitted to state in their pleadings that they were qualified citizens of Cass county, and that the duty was not ministerial, but of a judicial character, that officer having to make calculations and determine whether or not the returns were properly certified, and whether the election, as shown by the returns, was conducted according to law, and the returns made to him in accordance with the statute; and the law providing no mode for reviewing his judgment, it was to be held as final.

The court in this case declaring that "When the performance of a ministerial duty is enjoined by law upon a public officer, or inferior judicial tribunal, the court upon an application for a *mandamus* will judicially determine the legal rights of the applicant, and will of necessity decide whether the duty exists."

This opinion certainly states the existence of the citizen's

*right* to a *mandamus*, and the determination of the court to enforce the right when the occasion requires it.

I believe the four cases cited in the opinion, and here referred to, do not weaken in the slightest degree the position I have assumed, that a *mandamus* will lie to compel a public officer to perform a duty required of or cast upon him by law, when that duty is purely ministerial in its character (as is the duty of the Comptroller in this case), when that duty does not involve the exercise of judgment or official discretion.

I further believe that these four cases establish the principle just stated, so far as the declaration of a court's opinion can go in a case where it is necessary to declare the opinion of the court.

I will refer to decisions of our court which establish the principle stated, either by necessary implication or direct decision or declaration.

This principle was declared in Board of Land Commissioners v. Bell, Dallam, 366. In the case of Bradley v. McCrabb, Dallam, 504, the peremptory *mandamus* was granted by the District Court and affirmed by this court. In the case of Roman v. Moody, Dallam, 512, the District Court granted a *mandamus*, and this court affirmed the judgment. In Cullum's Administrator v. Latimer, 4 Texas, 334, the court said, "The writ issues to compel the performance of a duty," and reversed the judgment of the District Court, which had refused the *mandamus*. In the case of Horton v. Brown, 2 Texas, 98, a *mandamus* issued to compel the Commissioner of the Land Office to issue a patent. In Horton v. Pace, 9 Texas, 81, the principle was upheld that a *mandamus* would issue when the party showed a right under the law applying to his case. In McLelland v. Shaw, 15 Texas, 319, which was a proceeding to recover a bounty or allowance from the government to those who had been carried prisoners from San Antonio to Mexico, the court held that a *mandamus*

should not be granted, *because* the evidence showed that petitioner had not been carried as a prisoner to Mexico, or out of San Antonio. The principle was not, however, called in question, that in a case coming within the terms of the act a *mandamus* would issue. In Durrett v. Crosby, 28 Texas, 687, the principle is adhered to.

The case of League v. De Young, 2 Texas, 200, cited in brief of appellant, on examination will be found not in conflict with the authorities here cited.

League sought by *mandamus* to compel the district surveyor to survey on a fraudulent land certificate, for the purpose of testing the constitutionality of the land law. The court decided that it was in effect a suit against the State, and of an evasive character ; the complainant not having sued the State in the mode pointed out by law, he could not be heard in the mode selected by him.

The case of the Houston Tap and Brazoria Railroad Company, heretofore alluded to, and which has been relied on in argument, and which is declared by Judge Ferris to have authoritatively settled the question of *mandamus* to a public officer in this State, I will endeavor to show does not in principle antagonize what I have assumed, namely, the power of the court, under the authority of numerous decisions of our own and other courts, to issue a *mandamus* to a public officer commanding him in a merely ministerial act to obey the law. While the court in that case declared in general terms that a *mandamus* would not lie to compel the Treasurer to pay a warrant, and while the opinion in that case contains an interesting and able disquisition on the functions, duties, and possible abuse of powers by the co-ordinate departments of the government, yet, properly considered, that portion not bearing on the pleadings or facts of the case cannot be held as a part of the judgment in that case : first, because it was necessary for the decision of the question ; second, because the question turned and was

decided upon the insufficiency of the warrant, signed only by the Governor and Attorney-General, and the defective character of petitioners' pleadings, they failing to aver that the railroad was one of those entitled under the law to the loan from the school fund, which last objection was an all-sufficient one.

Again, in this case the court laid a stress on the fact that although the law required the action of the Governor, the Attorney-General and Comptroller, it appears that the first two had only signed the warrant or certificate, and the court said: "It is not contended that the warrant would be valid unless the Comptroller had participated with the other members of the board when the claim was acted on by them." This was no doubt the correct view, and has been so held in other States. (See Hamilton v. The State, 3 Indiana, 452, and cases there cited.)

While the pleadings and facts in the case of the Houston Tap and Brazoria Railroad Company completely sustain the judgment of the court in refusing the *mandamus*, I believe an examination of the case shows that the conclusions drawn from it in the briefs and argument of appellant's counsel, and in the opinion in the present case, are far beyond its legitimate effect; that the objections here presented to its being extended beyond the question presented by and decided in that case are fully sustained, and that it cannot be legitimately invoked as overthrowing a long line of decisions, from the earliest days of the Republic down to that time. Whatever application might have been made of that case to others when it was decided, does not and cannot now exist. The broad principle laid down, outside of the case, with reference to issuing the writ of *mandamus*, has been, as already alluded to in this opinion, overruled in the case of the Houston and Great Northern Railroad Company v. Commissioner of the General Land Office, 36 Texas, 399.

The acknowledgment of the power of the court to issue the writ of *mandamus* and the exercise of that power by the courts of Texas, with reference to public officers, being shown, a reference to the decisions of .the Supreme Court of the United States and the Supreme Courts of .the different States will show that the principle has been sustained in numerous cases.    The following cases referred to in the brief of appellee's counsel fully sustain the position: See 1 Cranch, 137; 12 Peters, 526; 5 Ohio St., 529; 23 Missouri, 353; 4 Minnesota, 309; 7 Ohio St., 372 ; 5 Hamilton, Ohio, 358; 8 Monroe, Ky., 440; 14 Ark., 687 ; 10 Wisconsin, 518 ; 6 Ohio St., 318; 4 Michigan, 27 ; 12 Ohio, 54 ; 3 Indiana, 452;  19 Barbour, 472; 23 Barbour, 339; 1 Selden, 65; 15 Barbour, 529; 12 Barbour, 607;  4 Hill, 634; 41 Maine, 15; 17 Howard, 275; The People v. The Secretary of State *et al.*, 58 Illinois, 90.

The leading and among the earliest cases in the United States, since their organization under the Constitution, is the case of Marbury v. Madison, 1 Cranch, 167, which originated in a petition for a *mandamus* to Mr. Madison, Secretary of State, to compel him to deliver to Marbury and three others commissions as. justices of the peace for the District of Columbia, which had been signed by Mr. Adams, but not delivered previous to the expiration of his term of office.

The Supreme Court, as is well known, decided that the court had no original jurisdiction beyond that declared in the Constitution, and which limited its jurisdiction to the enumerated cases "affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party;" that Congress could not in violation of the Constitution confer jurisdiction upon the court; and the proceeding being an original proceeding and not within the constitutional grant of power, it could not be heard.

38

Chief Justice Marshall, knowing the importance of the principle involved in that case, felt that the occasion demanded from the court a full exposition of the nature of the writ ; that its importance alike to the individual citizen and the country at large required a declaration of the powers and duties of the courts to compel a public officer to perform a plain and positive ministerial duty, imposed upon him by law, where no other adequate remedy or mode of proceeding was open to the citizen. He delivered a lengthy opinion, distinguished as much for its simplicity of statement as it is for its broad illustration and logical deductions, in which the entire question is reviewed and conclusions stated on the power to issue the writ of *mandamus*.

This opinion is considered the ablest ever delivered on this subject, and worthy of the enlightened and profound jurist who declared it. It stands out as a great landmark to the profession, and has been respected and followed in principle for nearly three-fourths of a century.

In this opinion Judge Marshall, quoting from 3 Blackstone, page 23, declares : "It is a general and indisputable rule, that where there is a legal right there is also a legal remedy, by suit or action at law, whenever that right is invaded;" and at page 164, that "it is a settled and invariable principle, in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress." And speaking of this country, Judge Marshall declares that which we have all been taught, but which it is well frequently to repeat : "The government of the United States has been emphatically termed a government of laws and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right."

After alluding to the powers of the President of the United States, of his right to appoint certain officers—and

in that case the Secretary of State—and of the absolute immunity from civil interference in the discretion to be exercised on all political questions, the court used the following language : "But when the Legislature proceeds to impose on that officer other duties where he is directed peremptorily to perform certain acts, when the rights of individuals are dependent on the performance of those acts, he is so far the officer of the law, is amenable to the laws for his conduct, and cannot at his discretion sport away the vested rights of others."

In this case Judge Marshall, after a full discussion of the question, showed that the views of the court were not novel, that it was but adhering to established legal usage and judicial precedent, and quoted from Lord Mansfield, in the case of The King v. Baker, 3 Burrows, 126, as follows: "Whenever there is a right to execute an office, perform a service, or exercise a franchise (more especially if it be in a matter of public concern or attended with profit), and a person is kept out of possession or dispossessed of such right, and has no other specific legal remedy, this court ought to assist by *mandamus*, upon reasons of justice, as the writ expresses, and upon reasons of public policy, to preserve peace, good order and good government."

The question of *mandamus* came again before the Supreme Court of the United States in the case of Kendall v. The United States, 12 Peters, 532. In that case Congress passed an act authorizing the Solicitor of the Treasury to examine the accounts and report the amount due Stokes and other mail contractors, and directing the Postmaster General to pass to the credit of the parties, on the books of his office, the amount ascertained by the solicitor to be due them.

That officer made his report and found a large amount due the parties for carrying the mails.

The Postmaster General passed to the credit of Stokes

and his associates a portion of the amount stated by the Solicitor of the Treasury and refused to credit the balance, some forty thousand dollars—he, from data furnished by his office, being satisfied that he had passed to their credit the amount justly due.

A *mandamus* was sued out from the United States Circuit Court for the District of Columbia, and judgment rendered against the Postmaster General, who brought the case by writ of error to the Supreme Court.

The case was thoroughly argued by some of the ablest counsel in the country, and a judgment rendered affirming the decree of the Circuit Court.

The dissenting opinion turned, not on the power of the court to hear and determine a suit of that character, but upon the question whether or not the Circuit Court had, under the law, jurisdiction to issue the writ of *mandamus*, not alone in that case but in any case.

The decisions of the courts in the various States sustain and have enforced the principle that a *mandamus* will lie to compel a public officer, where the law declares it a ministerial act, not necessarily requiring the exercise of judgment or display of discretion.

In the case of Griffith v. The Secretary of the Land Office, 5 Binney, the Supreme Court of Pennsylvania asserted the law to be that a *mandamus* would lie where the act to be performed was of a ministerial character, not involving judgment or discretion, and when there was no other specific remedy.

In the case of Page, 2d Auditor, v. Howard, 8 Ky., 648, it was held that the 2d Auditor—an officer in that State performing duties similar to the Comptroller in this—had no discretion "to issue or not to issue the salary due an officer." The court then declared that "the executive department and all its officers are as much bound by the constitution and laws as the legislative, and have no more power to violate these laws;" * * *

that " the judiciary pretends to no direct control over the action of the Legislature or of the supreme executive, but it may decide upon the validity of the acts of either, affecting private rights, and by the writ of *mandamus* it may coerce a ministerial officer, though of the executive department, to the performance of a legal duty, for the infraction of a legal right."

In the case of Napa Valley Railroad Company v. Napa County, 30 California, 437, the court held that "according to a well settled rule of construction, when a public body or officer has been empowered to do an act which · concerns the public interest, the execution of the power may be insisted on as a duty," * * * and that "railroads concern the public interest, as a matter of legal judgment."  (Citing 3 Hill, N. Y., 615 ; 2·California, 412 ; 3 Paige, N. Y., Clarke v. The·City of Rochester ; 5 Id., 124.)

In the case of Chatterton v. The Secretary of State, 58. Illinois, 9, in a. petition to compel the State 'Auditor to draw his warrant on the State Treasurer for the contract price of 1000 reams of printing paper, and to compel the Treasurer to pay the same, the prayer of the relator was granted, and a peremptory *mandamus* directed to issue, " requiring the Auditor to draw his warrant for the 1000 reams received by the State, and requiring the Treasurer to countersign the same, and to pay it when there shall . be funds in the Treasury subject to its payment."

In the case of the State of Ohio v. Todd and others, 4 Hammond's Ohio Reports, 351, a rule was issued against the Court of Common Pleas to show cause why a *mandamus* should not issue to compel them to sign "a bill of exceptions."  The court held the power existed, and said : "The authority to issue a *mandamus* in a case like the present cannot be doubted.  The power is incident to supervising courts, and there are instances of its exercise both in England and this country."

In the foot-notes of this case reference is made to the case of State of Ohio v. Moffit, 5 Ohio, 358, where "a *mandamus* was allowed to compel the Speakers of the two houses of the General Assembly to sign a certificate of an election ;" and in 5 Ohio, 542, "to compel judges to proceed with a trial ;" and in 9 Ohio Reports, Smith v. Commissioners, etc., "to compel an auditor to issue an order for fees to which the party was entitled."

In Chamberlain v. Henry 'H. Sibley, Governor, etc., 4 Minnesota Reports, 309, the court declared that when "some official act not necessarily pertaining to the duties of the executive of the State, and which might as well be performed by an officer, is directed by law to be done, then any person who clearly shows himself entitled to its performance, and has no other adequate remedy, may have a writ of *mandamus* against such officer, even although the law may have designated the chief executive of the State as a convenient officer to perform the duty."

In the case of Duffield *et al.* v. Whittemon, 4 Gibbs' Michigan Reports, 28, an application was made to compel by *mandamus* the State Treasurer to give notice that the notes of the Government Stock Bank at Ann Arbor would be redeemed at the State Treasurer's office—the bank having failed to redeem when demanded, taking for the purpose of evasion a single note, putting it through a pretended scrutiny in regard to its genuineness, then paying on that note, taking the next and passing it through a pretended examination, and so on during bank hours. The Treasurer, on affidavits stating the facts, delayed and evaded the requirements of the law. The court directed the writ of *mandamus* to issue against him.

In the case of Robert H. Morris v. Edmonds, etc., 15 Barbour, 529, a motion was made for a *mandamus* to compel Edmonds, as chamberlain of the city, and treasurer of the city and county of New York, to pay the amount of an account approved by the Board of Super-

visors of the county. The court sustained the motion, and ordered a peremptory *mandamus* to enforce the payment. It was said in the argument before this court that the great interests (in a money point of view) with which the Comptroller of the State is entrusted render it improper to award a *mandamus*. His official action is concerned, and yet it is well known that the officer in the case just cited is entrusted with moneyed interests many times greater than those committed to the direction of the Comptroller.

"In the matter of James Turner," 5 Hammond's Ohio Reports, 542, in which a proceeding was had by *mandamus* to compel the Court of Common Pleas of Fairfield county to proceed with the trial of Turner on an indictment for murder, a peremptory *mandamus* was granted, [the court saying the court below might have exercised discretion if deemed proper, but they could not abstain from action, as a failure of justice might follow.

The citation of cases might be extended, if deemed necessary to show that the power to issue the writ is of the broadest character as regards the position of the person against whom it is sought, and that in its enforcement in proper cases there is no official dignity above its reach.

It was stated in the argument of appellant, and is intimated in the opinion of the majority of the court in this case, that there was danger of an encroachment by this branch of the government on one of the co-ordinate branches of the government, and remarks in the way of a caution to the court were made. The past history of this court, through all the twenty-eight years of its existence, and composed as it has been of twenty-two members, negatives any presumption of encroachment or undue assumption of jurisdiction on its part. The present, like its former members, are aware that its real strength lies in its adherence to well established principles, and that

anything like even an attempted encroachment upon the rights of other departments of the government would be merely grasping at the shadow and losing the substance.

In all its history but one instance of the kind can be found, and that long-to-be-remembered case presents a striking example of the want of power and utter failure on the part of any department of the government of this State when it attempts an encroachment upon the rights or powers of the others. The plain duty and the sole mission of this court is an adherence to established principles and in all cases to follow the law.

Justice Moore, having been of counsel, did not sit in this case.